JASON M. FRIERSON
United States Attorney
Nevada Bar No. 7709
DANIEL R. SCHIESS
Assistant United States Attorney
Nevada Bar No. 5483
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
Tel: (702) 388-6336
Fax: (702) 388-6418
dan.schiess@usdoj.gov

*Representing the United States of America*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| **United States of America,** | Case No. 2:21-cr-00219-APG-DJA |
| **Plaintiff,** | **Government's Response to Defendant's Motion to Suppress Evidence, ECF No. 36** |
| **v.** | |
| **Joshua A. Martinez,** | |
| **Defendant.** | |

**CERTIFICATION: This response is timely filed.**

## I.      INTRODUCTION

The Las Vegas Metropolitan Police Department (LVMPD) executed several search warrants in January and February 2021 for evidence that Martinez had stalked and harassed a LVMPD officer, among other crimes. Firearms, ammunition, and other evidence were recovered during the searches. This led to Martinez being charged federally with being a felon in possession of firearms and ammunition. ECF No. 1. Martinez now

moves to suppress evidence obtained from the searches, claiming that the search warrants lacked probable cause and specificity. ECF No. 36. But under the totality of the circumstances test for probable cause, the issuing judge had sufficient information to issue the warrants. And under specificity standards, the warrants provided probable cause to seize specific items and adequately described categories of items to guide the officers conducting the searches. The Court should deny Martinez's motion to suppress.

## II.   FACTUAL BACKGROUND

**A.   The Search Warrants**

Although LVMPD obtained several search warrants for evidence against Martinez, he addresses five in his motion to suppress:

1. A January 13, 2021 warrant to Facebook (**"the January Facebook Warrant"**), ECF 36-2; (as stated below, the government will not be defending this Facebook warrant in this response);

2. A February 18, 2021 warrant to search Martinez's residence at 4420 Faberge Avenue, Las Vegas, ECF No. 36-3 (**"the Residential Warrant")**;[1]

3. A February 19, 2021 piggy-back warrant to search vehicles at the 4420 Faberge residence (**"the Vehicle Warrant"**), ECF No. 36-4;

4. A February 22, 2021 warrant to Facebook for records from Martinez's account ("**the February Facebook Warrant**") ECF No. 36-7, and

5. A February 24, 2021 warrant to search phones and digital devices ("**the Phone Warrant**"), ECF No. 36-8.

---

[1] The affidavit used to obtain the Residential Warrant was simultaneously used to obtain a search warrant for property Martinez occupied at 1702 W. Ilene Avenue, Moapa, Nevada. Martinez did not move to suppress evidence obtained from the Moapa property. This response focuses only on the warrants he challenges.

**B.     Martinez Has a Violent Criminal Background and Believed He Could Kill Police Officers for Unlawful Conduct.**

According to the affidavit in support of the Residential Warrant, for years LVMPD was aware the Martinez had engaged in anti-government and anti-law enforcement activities. ECF No.36-3 at 7-9. He was known as a First Amendment Auditor, that is, someone who creates confrontations with law enforcement officers or other authority figures and commonly video-records those confrontations for viewing on YouTube channels. *Id.* at 7-9.

The affidavit also stated that Martinez sustained several criminal convictions, including two since he began engaging in his First Amendment auditing activities: false statement to a police officer, and attempted carry concealed weapon without a permit, a felony. *Id.* at 7 and 20. Clark County Deputy District Attorney Michael Dickerson prosecuted Martinez on the concealed weapon charge. *Id.* LVMPD Det. Kenneth Mead, who was not assigned to the gun case, helped Dickerson by once carrying copies of Martinez's social media posts to Dickerson at Martinez's 2019 sentencing hearing. *Id.* at 7.

The affidavit also stated that during the sentencing hearing, the court became aware that Martinez had made "numerous threatening Facebook posts [] glorifying the killing of police officers." *Id.* at 19. One post contained a picture "of a police funeral and implying cops should die, advocating force and violence towards law enforcement." *Id.* at 20. When questioned by the court about the posts, Martinez admitted that he "felt people could shoot and kill law enforcement based on unlawful police action." *Id.* at 19-20.

3

**C.    After Martinez's Sentencing Hearing, He Continued to Advocate Violence and Targeted Detective Mead.**

The affidavit identified several posts Martinez made to his public Facebook page. One was posted on December 9, 2020, and contained a picture from the movie "Troy" and a statement saying, "When the boogaloo's kicked off and your friend can't bring himself to put the blood gurgling alphabet boy (common anti-government slang for a member of the FBI, CIA, NSA, etc.) out of his misery; That's why no one will remember your name." *Id.* at 14-15. Martinez also stated in the post: "Don't forget assholes from the fusion center." *Id.* The affidavit then stated that Mead worked at the LVMPD fusion center. *Id.*

The affidavit also included posts containing resistance and violence that Martinez made to his Facebook page between December 22, 2020, and January 2, 2021. *Id.* at 13-15. They included references to a guillotine, a politician hanging from an overpass, and ATF agents having "chosen death." *Id.*

The affidavit said that Martinez made several posts to his Facebook page on January 6-7, 2021, including the following:

1.  1/6/2021 – Martinez posted a picture of Ashli E. Babbitt (killed during a riot at the U.S. capitol building on 01/06/2021) with the caption "Remember this face next time you bootlickers want to wave your blue line flag. Get your heads out of your asses." *Id.* at 13.

2.  1/6/2021 – "What country can preserve its liberties if their rules are not warned from time to time that their people preserve the spirt of resistance? Let them take arms!!!" *Id.*

3.  1/6/2021 – Martinez posted a picture of human skulls underneath the words "Make politicians hang around!" *Id.*

4.  1/6/2021 – Martinez posted "The tree of liberty must be refreshed from time to time with the blood of patriots and tyrants." *Id.*

5. 1/7/2021 – Martinez posted a picture of two armed militia groups with caption "Just imagine if these two groups United. We could really make a change. What a shame that people would rather fight each other than go after the real enemy." *Id.* at 12-13.

The affidavit identified a January 6, 2021, post in which Martinez accused Mead of "trying to make [his] life a living hell" and of being "an enemy to the constitution." *Id.* at 6. He also asked "activists [] in Las Vegas" to "keep an eye out for him." *Id.*  In that post, Martinez posted three pictures of Mead, and told activists to contact him (Martinez) for more information. *Id.* One person commented on the post: "This snowflake has a very punchable face." *Id.*  Elsewhere in affidavit, Mead said that Martinez regularly posted photographs and videos of him and content describing him as "unconstitutional" and encouraged people to contact him (Martinez) so he could disseminate Mead's personal information. *Id.* at 21.

**D.    LVMPD Obtains the Facebook Warrant for Martinez's Non-Public Facebook Pages.**

On January 13, 2021, LVMPD obtained the Facebook Warrant to search Martinez's non-public Facebook pages for evidence of stalking with use of the internet and conspiracy to intimidate a public officer. ECF No. 36-2.

**E.    On February 17 and 18, Martinez Threatens Mead and Dickerson.**

The Residential Warrant affidavit states that on February 17, 2021, at 8:37 p.m., Packe learned that Martinez had called LVMPD on its 311 recorded line. ECF No. 36-3 at 15-16. According to the affidavit, Martinez asked to speak with Mead, claiming that Mead had his personal property. *Id.* The affidavit also stated that Martinez asked the dispatcher to have Mead call him back. *Id.* When Mead received the call from the dispatcher, he asked

the dispatcher to flag the call because Martinez had threatened him before. *Id.* Mead then immediately called Packe, his supervisor, to report what Martinez had done. *Id.*

According to the affidavit, Packe then conducted an open-source search of Martinez's Facebook page. *Id.* at 16. He saw that at 8:45 p.m., a few minutes after Martinez had called the 311 line, Martinez had posted to his Facebook page a picture of Dickerson in a court setting with the following statement: "This is Michael Dickerson. He is Detective Kenneth Meads [sic] Bitch. Dickerson, I hope YOU and Mead die a slow and painful death. I hope your family witness [sic] it. Mead, I have a message for you (Molon Labe)." *Id.* at 16-17. Sgt. Packe explained that the "'Molon Labe' is a classical Greek phrase meaning 'come and take it (them)', attributed to King Leonidas of Sparta as a defiant response to the demand that his soldiers lay down their weapons." *Id.* Sgt. Packe also said that "[g]un-rights advocates have adopted the phrase as a challenge to perceived attempts by the government to confiscate firearms," and that based on his "training and experience in domestic extremists investigations, [he] believe[s] it is reasonable to believe that the use of this sort of language would be construed as a challenge from Martinez to Mead, in order to force a confrontation wherein Mead (or other officers) attempt to seize Martinez's weapons." *Id.* at 17.

The affidavit also stated that Packe saw that about three hours later Martinez had posted to his Facebook account a link to an article that featured an interview with Martinez. *Id.* According to the affidavit, Martinez "essentially blames Det. Mead for targeting him for arrest and his subsequent time spent in custody." *Id.* at 17.

According to the affidavit, about an hour later (in the early morning of February 18), Martinez posted to his open-source Facebook page a statement saying: "I cant [sic]

6

wait to see the news and hear that Detective Kenneth Mead is in that casket." *Id.* at 18. Below that statement is "an unknown picture of nine police officers carrying a flagged draped coffin." *Id.* at 18. Sgt. Packe said noted that the picture represented how police officers generally conducted funerals for police officers. *Id.*

According to the affidavit, on February 18, Packe conducted an open-source search of an Instagram account that apparently belonged to Martinez. *Id.* He saw a page containing an undated photograph of Martinez holding what appeared to Sgt. Packe to be an AK-47 rifle. *Id.* He also saw on the Instagram account the same picture of the police officers carrying the flagged-draped coffin. *Id.* The picture was posted on February 19, 2021. *Id.* A caption above the picture read: "How police officers take out their trash," and a comment below the picture read "battlebornmedia Rip Mead." *Id.*

**F.   Martinez Causes Mead and Dickerson to Fear for Their Safety.**

According to the affidavit, Packe interviewed Mead and Dickerson. *Id.* at 19-22. They told him that Martinez's recent posts caused them to fear for their safety. *Id.* Also according to the affidavit, Dickerson said that he took immediate steps to protect himself, his family, and his home. *Id.* at 19. Dickerson also said that he believed that Martinez's Molon Labe post indicated that Martinez possessed a firearm. *Id.*

According to the affidavit, Mead said that he took safety precautions at his residence, and with his family, employer, neighbors, including seeking a protective order against Martinez. *Id.* at 22. The affidavit also said that Mead said that Martinez has engaged in a course of conduct against him that would make a reasonable person feel harassed. *Id.* He identified Martinez's online activity and said that Martinez's social media activity and rhetoric have been escalating for several months. *Id.* He mentioned Martinez's

January 6, 2021, "threat" post in which he accuses Mead of being "an enemy to the constitution" and asked activists to "keep an eye out for him." *Id.*

In the affidavit,  Packe noted that as of February 18, 2021, Martinez had 784 friends on his Facebook account and was followed by 91 other people. *Id*. at 22. Sgt. Packe said that many of those "individuals harbor anti-government/anti-law enforcement sentiments and have participated in armed resistance against government authorities" and were Martinez's "target audience" to continue harassing Mead. *Id.* at 22-23.

**G.    LVMPD Obtains the Residential Warrant to Search Martinez's Residence.**

On February 18, 2022, Packe obtained the Residential Warrant. ECF No. 36-3. The warrant sought evidence of four crimes: aggravated stalking, stalking with use of the internet, harassment, and fight or challenge to fight involving use of a deadly weapon. *Id*. at 5. Packe stated in the affidavit that Martinez intended to harass Mead and to use the internet to harass Mead and Dickerson, and that Martinez's course of conduct would have caused a reasonable person to feel harassed and fearful for their immediate safety. *Id.* The warrant authorized LVMPD to seize the following items:

1.    firearms and firearm-related items,

2.    digital or physical items indicating planning, ideology, and/or preoperational surveillance, including the following specific items to include maps, drawings, concert tickets, hotel room reservations and receipts, notes, pictures (digital or physical), cameras, video recorder, or digital media, flash drives, and computers, hard drives, laptops, cellular telephones, and tablets with may contain such items,

3.    persons located in the premises at the time of service,[2]

4.    vehicles located in the premises at the time of service,

---

[2] The Residential Warrant listed "persons" and "vehicles" in the items to be seized. This seems to have been a mistake because persons and vehicles are search locations, not items to be seized. According, they will not be treated here as items to be seized.

8

5.      items tending to establish the identity of the persons in control of the premises, and

6.      items relevant to the motivation or identity of the perpetrator.

*Id.* at 4-5.

Numerous items were recovered from the residence, including firearms, firearm-related items, and digital devices. Exhibit A.

**H.      LVMPD Obtains the Vehicle and Phone Warrants.**

According to the affidavit in support of the Vehicle Warrant, LVMPD set up surveillance at Martinez's residence before executing the Residential Warrant. ECF No. 36-4 at 4. There officers saw several people apparently moving items between the residence and vehicles parked along the side the residence. *Id.* One person, later identified as Lawrence Estrada, Martinez's stepbrother, was seen carrying a gun case from the residence to one of the vehicles, a white Nissan. *Id.*

Surveillance also saw Martinez leave the residence and drive away in a Ford Expedition with his father. *Id.* Shortly thereafter, Martinez was arrested. *Id.*

Thereafter officers approached Estrada, who was by then standing next to the Nissan. *Id.* He admitted that he owned firearms and had moved a firearm from the residence to the Nissan. *Id.* Detective Ameel Jacob then telephonically applied the warrant to search four vehicles identified with the residence. ECF No. 36-4.

In the Vehicle Warrant application, Jacob opined that based on his training and experience it is common for individuals living with prohibited people to move contraband between houses and cars, including firearms, to evade detection by law enforcement. *Id.* at 5. Additionally, he concluded that the people seen moving items from the residence to the

vehicles may have been moving firearms. *Id*. Jacob had 6 ½ years with LVMPD, including 2 ½ years with the Counter Terrorism section. *Id.* at 2.

The Vehicle Warrant authorized LVMPD to seize evidence of the four crimes identified in the Residential Warrant, plus another crime – prohibited person in possession of a firearm. *Id.* at The warrant authorized LVMPD to seize the following items:

1.    Firearms and firearm-related items,

2.    mobile phones and digital devices (for seizure only, and their contents to be searched later pursuant to a warrant to be obtained), and

3.    items establishing the identity of the person having control of the mobile phones.

*Id.* at 3.

An AK-47 and eleven magazines loaded with ammunition were seized from the Nissan. ECF No. 36-4 at 9. A red iPhone, three shotgun shells, one thumb drive, and two silver magazines were seized from the Ford Expedition in which Martinez was arrested. *Id.* at 18.

Days later, LVMPD obtained the February Facebook Warrant and the Phone Warrant. The Phone Warrant authorized LVMPD to search the red iPhone. ECF No. 36-8. The affidavit contained information suggesting that the phone belonged to Martinez – it was found on the passenger seat of the Expedition when he was arrested. *Id.* at 21. The warrant authorized LVMPD to seize evidence of four crimes: aggravated stalking, stalking with use of the internet, harassment, and prohibited person in possession of a firearm ("**the Target Crimes**"). *Id.* 28. It did not seek evidence of fight or challenge to fight with use of a deadly weapon. *Id.* The warrant authorized LVMPD to seize the following items:

1.    user or device created data that was evidence of the Target Crimes, and

2.    items establishing the identity of the person with control of the mobile phone.

*Id.*

## III.   ARGUMENT

A valid search warrant requires probable cause and specificity. The Residential, Vehicle, and Phone Warrants met these requirements.

### A.   Legal Framework for Probable Cause

Probable cause exists when "under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). "Probable cause determinations are 'commonsense, practical' questions, and a 'fair probability's is less that a preponderance of the evidence." *United States v. Flores*, 802 F.3d 1028, 1044 (9th Cir. 2015) (quoting *United States v. Gourd*, 440 F.3d 1065, 1069 (9th Cir. 2006)(en banc). Probable cause does not require a magistrate to engage in a more-likely-than-not analysis, but only to "conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Ruiz*, 758 F.3d 1144, 1148 (9th Cir. 2014) (internal citations omitted). Additionally, an issuing judge's "determination of probable cause should be paid great deference by reviewing courts." *Spinelli v. United States*, 393 U.S. 410, 419 (1969) (abrogated on other grounds by *Gates*, 462 U.S. 213).

**B.    The United States Is Not Defending the January Facebook Warrant Here, but None of the Evidence Obtained From the Facebook Warrant Was Used to Obtain the Other Warrants.**

The government's decision not to defend the January Facebook Warrant does not affect the Residential, Vehicle, and Phone Warrants because those warrants did not rely on evidence obtained from the Facebook warrant to establish probable cause. The probable cause statements in each warrant bear out this claim. Specifically, the Residential, Vehicle, and Phone Warrants do not contain a single reference to evidence obtained from the January Facebook warrant, and each probable cause statement in those warrants shows that each was derived from independent sources. *See Murray v. United States*, 487 U.S. 533, 537-538 (1988). Consequently, the Fruit-of-the-Poisonous-Tree Doctrine does not apply to the Residential, Vehicle, and Phone Warrants.

**C.    Discussion of the Target Crimes**

Set forth below is a brief statement of the Target Crimes.

**Aggravated Stalking.** A person commits the crime of aggravated stalking when the person stalks another person and, in conjunction with the stalking, threatens the person with intent to cause the person to be placed in reasonable fear of death or substantial bodily harm. NRS 200.575(3). Stalking occurs when "[a] person who, without lawful authority, willfully or maliciously engages in a course of conduct directed towards a victim that would cause a reasonable person under the circumstances to feel terrorized, frightened, intimidated, harassed . . . [and] that actually causes the victim to feel terrorized, frightened, intimidated, harassed or fearful for his or her immediate safety." NRS 200.575(1).

**Stalking with Use of the Internet.** "A person who commits the crime of stalking with the use of an Internet . . . to publish, display or distribute information in a manner that

substantially increases the risk of harm or violence to the victim," commits the crime of stalking with use of an internet. NRS 200.575(4).

**Harassment.** A person commits the crime of harassment when the person "(a) [w]ithout lawful authority, . . . knowingly threatens to [] cause bodily harm in the future to the person threatened . . . or to do any act which is intended to substantially harm the person threatened . . . with respect to his or her physical or mental health or safety, and (b) [t]he person by words or conduct places the person receiving the threat in reasonable fear that the threat will be carried out." NRS 200.571(1).

Each statute requires as an element that a person threaten another person. To that end, each statute requires that a person act intentionally or knowingly, which in essence requires a person to make a true threat. "A true threat is 'an expression of an intention to inflict evil, injury, or damage on another.'" *Fogel v. Collins,* 531 F.3rd 824, 830 (9th Cir. 2008) (quoting *Planned Parenthood v. Amer. Coalition of Life*, 290 F.3d 1058, 1075 (9th Cir. 2002)). The person making the threat need not actually intend to carry it out. *Virginia v. Black*, 538 U.S. 343, 359-360 (2003).

The Ninth Circuit generally applies both an "objective" and "subjective" test for assessing true threats. *See United States v. Bagdasarian*, 652 F.3d 1113, 1122 (9th Cir. 2011). The "objective" test considers "whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746 (9th Cir. 2021); *United States v. Keyser*, 704 F.3d 631, 638-39 (9th Cir. 2012). By contrast, the "subjective" test, which aligns more closely with the intent and knowledge requirements of Nevada's stalking and

1   harassment statutes, asks whether the speaker "subjectively intend[ed] to threaten."

2   *Keyser*, 704 F.3d at 638.

3         **Prohibited Person in Possession of a Firearm.** A person commits this firearm

4   crime when the person, having been convicted of a felony, possesses or has under his or her

5   custody or control any firearm. NRS 202.360.

6   **D.**    **The Affidavits Established Probable Cause to Believe that Martinez Committed
the Target Crimes.**

7         "A warrant must be based on probable cause that a crime has been committed.

8   *Maryland v. Pringle*, 540 U.S. 366, 372 (2003). And probable cause is based on the totality of

9   the circumstances. *United States v. Luong*, 470 F.3d at 902. The warrant affidavits supported

10  the issuing judge's finding of probable cause that Martinez committed the Target Crimes.

11      **1.**    **The affidavit established probable cause that Martinez committed the
Target Crimes of aggravated stalking, stalking with use of the internet,
and harassment.**

12

13

14        Martinez contends the affidavits failed to establish probable cause that he

15  committed stalking and harassment because they failed to establish probable caused that he

16  made a true threat. He is wrong. Under the totality of the circumstances, the affidavit

17  establishes a fair probability that Martinez made a true threat against Mead and Dickerson.

18        Martinez posted explicit statements, directed at Dickerson and Mead *by name*,

19  hoping for their "slow and painful death[s]" and including a Latin phrase commonly used

20  by gun-rights advocates as a challenge to armed confrontation. One of Martinez's posts

21  referred to putting "blood-gurgling" law enforcement officers "out of their misery," with

22  the ominous addition "Don't forget assholes from the fusion center," *i.e.*, where Mead

23

24

         14

1    worked. In another post, Martinez described looking forward to seeing Mead in a casket.

2    Still in another, Martinez stated "battlebornmedia Rip Mead."

3         Moreover, in assessing whether a true threat was made, courts look to the entire

4    factual context and surrounding events. *United States v. Orozco-Santillan*, 903 F.2d 1262,

5    1265 (9th Cir. 1990) ("Alleged threats should be considered in light of their entire factual

6    context, including the surrounding events . . . ."), overruled in part on other grounds by

7    *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058,

8    1066-1070 (9th Cir. 2002). Courts also consider whether the threatening speech targeted a

9    specific individual. "In most cases where courts have found that speech constituted a true

10   threat, the threatening speech was targeted against specific individuals or was

11   communicated directly to the subject of the threat." *United States v. Fogel*, 531 F.3d 824, 830

12   (9th Cir. 2008).

13        Additionally, courts consider a victim's reaction to a threatening statement. *See*

14   *Watts v. United States*, 394 U.S. at 708 (holding that no true threat existed because the

15   "reaction of the listeners," among other factors, did not indicate a true threat); *Fogel*, 531

16   F.3d at 832 (stating that defendant did not subjectively intend his speech as a true threat

17   because '[n]one of the officers interpreted [defendant's] words or actions as threatening,"

18   among other reasons); *United States v. Davis*, 876 F.2d 71, 73 (9th Cir. 1989) (stating that

19   evidence of the "recipient's state of mind" and his or her "actions taken in response" is

20   relevant to evaluating a threating communication), *abrogated on other grounds by Black*, 538

21   U.S. at 363.

22        Here, the context in which these posts were made bolster the conclusion that these

23   were "true threats." The Residential Warrant affidavit recounts how Martinez stated in

24

open court that he believed he could kill law enforcement officers for acting unlawfully. ECF No. 36-3 at 19. It also recounts that Martinez accused Mead of attempting to sabotage his gun case, *Id. at* 10, and of being an "enemy of the constitution." *Id.* at 21.  The affidavit shows that Martinez posted other pictures and comments containing violent rhetoric towards law enforcement and government officials generally. *Id.* at 12-15. He posted about a "guillotine," revolutionary war, "politician hanging from an overpass," "BOOG"[3] and revolution, and ATF agents "having chosen death." *Id.* He also posted comments and pictures, including: "people preserv[ing] the spirit of resistance" and "Let them take arms!!!," a picture of human skulls underneath the words "Make politicians hang around," and the quote "The tree of liberty must be refreshed from time to time with the blood of patriots and tyrants." *Id.*

In addition, the affidavit describes how Martinez called the LVMPD 311 line claiming that Mead had his property and asking for a call back from Mead. *Id.* at 15-16; and then, just eight 8 minutes later, Martinez posted threats directed toward Dickerson and Mead. Specifically, he posted the picture of Dickerson in court and above the picture he wrote: "Dickerson, I hope YOU and Mead die a slow and painful death . . . [and] Mead, I have a message for you (Molon Labe)." *Id.* This indicated to Packe that Martinez was challenging Mead "to force a confrontation wherein Det. Mead (or other officers) [would] attempt to seize Martinez's weapons." *Id.* at 17.

The affidavit shows that Martinez made other posts targeting Mead. Three hours after the Molon Labe post, Martinez made a post in which he accuses Mead of targeting

---

[3] Sgt. Packe said that "BOOG is short for the Boogaloo, a common term used among anti-government groups denoting armed revolution against the government." ECF No. 36-3 at 14.

him for arrest and  blames him time he spent in jail. Then an hour later Martinez post the police funeral photo and says he can't wait to see news that Mead is in the coffin. Then the next day he reposts the police funeral photo on his Instagram page and writes: "battlebornmedia Rip Mead."

The affidavit recounts that Mead and Dickerson reacted to Martinez's posts by experiencing fear for their safety and taking steps to protect themselves.

But Martinez contends that the affidavit did not establish probable cause of stalking and harassment because he did not make a true threat. In support of that contention, he advances only his self-serving statement that he "did not intend his expressions as a threat" and attempts to urge that he engaged in protected speech. ECF No. 36 at 10.

Martinez is wrong. First, when reviewing for probable cause, courts consider only the information within the four corners of the affidavit. Martinez's statement about his intent is not in the affidavit, and is, therefore, irrelevant. Second, the totality of circumstances establish a fair probability that Martinez's statements were not political rhetoric or hyperbole. They were made directly toward Mead and Dickerson, the context shows he made those statement because he was upset that Mead and Dickerson had prosecuted him on the gun charge, and Mead and Dickerson reacted with fear. Furthermore, when Martinez's statements are considered in the context of his belief that he could kill law enforcement officers for unlawful conduct, the probability that he made a true threat increases.

### 2.   The affidavit established probable cause that Martinez committed the Target Crime of possessing firearms as a prohibited person.

Martinez also argues that probable cause failed to establish that he possessed firearms as a prohibited person. He says the only evidence addressing whether he possessed firearms as a prohibited person were (1) his status as a prohibited person, (2) the Molon Labe post, and (3) the undated photograph of him holding an AK-47. ECF No. 36 at 14-15. Martinez's anemic view of the evidence understates its significance.

First, the Molon post does not stand alone. According to Packe, the Molon Labe statement indicated that Martinez possessed a firearm. Indeed, Packe said that he believed that Martinez made the statement "to force a confrontation wherein Det. Mead (or other officers) [would] *attempt to seize Martinez's weapons.*" ECF No. 36-3 at 17 (emphasis added). Packe based his statement on his training and experience gained from his involvement in domestic extremists investigations. *Id.* at 17. He also had nineteen years as police officer with LMVPD, including three years a sergeant in the counter-terrorism section at the fusion center, *Id.* at 2.

Second, Dickerson also said that the Molon Labe statement indicated that Martinez possessed firearms. *Id.* at 20. Dickerson's belief was well grounded. He prosecuted Martinez on the gun charge and became familiar with Martinez's violent past, his numerous threatening Facebook posts glorifying the killing of police officers, and his many social media posts expressing his grievance against him (Dickerson). ECF No. 36-3 at 20.

Third, Packe said that Martinez held an AK-47 style firearm in an undated for photograph. Packe also explained that "firearms such as the above listed sought after

18

items" become extremely valuable possessions to prohibited persons and that they tend to keep these "coveted firearms for long periods of time." *Id.* at 24. Packe was likely referring to the AK-47 because it was the only firearm described in the affidavit.

Fourth, the combination of Martinez's statements about Mead hearing news that Mead is a casket, Molon Labe, "battlebornmedia Rip Mead" contributes to the fair probability that Martinez possessed firearms. Taken together, those statements imply that Martinez possessed firearms.

Finally, the probable cause statements in the Vehicle Warrant add to probable cause that Martinez possessed firearms. According to the affidavit, surveillance officers saw Estrada carry a firearm case to the Nissan, Estrada admitted that he carried a firearm to the Nissan, and Jacob expressed his belief based on his training and experience that "it was common for individuals living with prohibited persons to move firearms between homes and cars to [evade] detection by law enforcement." ECF 36-4 at 5. Based on Jacob's informed belief, he was not required to accept Estrada's statement that Estrada owned the firearm.

**E.      There was Probable Cause that Evidence of the Target Crimes Would be Found at the Residence.**

The Residential and Vehicles Warrants together sought four categories of evidence: (1) firearms and firearm-related items, (2) digital devices or physical items containing evidence of planning, ideology, and surveillance on digital devices or in physical form, (3) evidence of identity and motive, and (4) evidence of possession, custody, and control. Probable cause established that these items would be found in the residence.

The Residential Warrant affidavit provided probable cause to search the residence for evidence of the crimes. First, the affidavit demonstrated probable cause that Martinez stayed at the residence. Martinez's felon registration lists the residence. ECF No. 36-3 at 24. And Packe indicated that videos and pictures posted on Martinez's public Facebook account appear to have been taken from within the curtilage of the residence. *Id.*

Second, the affidavit established probable cause that Martinez kept firearm evidence at the residence. Packe said that prohibited persons keep coveted firearms for long periods of time and tend to collect firearm-related items and keep them at their residences and in their vehicles. *Id.*

Third, common sense dictates that evidence of other items – the non-firearm items – would be stored at the residence. Martinez published his threats over the internet. Common sense says that he stored electronic evidence of his crimes on digital storage devices (including phones) and kept the devices in his residence or sometimes in vehicles. Furthermore, Packe said that videos and pictures posted on Martinez's public Facebook account appear to have been taken from within the curtilage of the residence.

**F.      Legal Framework for Specificity**

The Fourth Amendment's specificity requirement has two aspects: particularity and breadth. *United States v. SDI Future Health Inc.*, 568 F.3d 684, 702 (9th Cir. 2009). "Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Id.* (quoting *In re Grand Jury Subpoenas Dated Dec. 10, 1987,* 926 F.2d 847, 856-57 (9th Cir. 1991)).

The Ninth Circuit consider three factors in analyzing the breadth of a warrant:

> (1) whether probable cause existed to seize all the items of a category described in this warrant;
>
> (2) whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and
>
> (3) whether the government could have described the items with more particularity in light of the information available.

*United States v. Flores*, 802 F.3d at 1044 (internal citation omitted).

### 1.   There was probable cause to seize virtually all the items of the categories described in the warrants.

#### a.   Firearms and firearm-related items

Martinez argues that probable cause did not exist under the Residential Warrant to seize firearms because firearms were not evidence of stalking and harassment. He is wrong. Under the totality of the circumstances, firearms were evidence of stalking and harassment. A true threat is an essential element of stalking and harassment. Evidence that Martinez possessed firearms is relevant to whether he made a true threat. To be sure, proof that Martinez possessed firearms would tend to show that he meant what he said when he challenged Mead to Molon Labe – try to take my firearms. Thus, evidence that Martinez possessed firearms would tend to show that Martinez subjectively intended to express a true threat. Possession would also tend to show that Martinez subjectively intended to express a true threat when he made the other statements directed towards Mead.

#### b.   Digital and physical evidence of planning, ideology, and preoperational surveillance

Martinez also argues that probable cause did not allow LVMPD to seize "digital or physical items indicating planning, ideology, and/or preoperational surveillance" because

21

these items were not described with specificity. ECF No. 36-3 at 19. He says the warrant failed to "state who was planning what" and failed to describe the ideology at issue, the operation subject to preoperational surveillance, or "how any of these search terms relate to the target crimes." *Id.* Here again Martinez imposes the wrong test. He used a hyper-technical approach instead of a commonsense approach. *Illinois v. Gates*, 462 U.S. at 236.

Common sense says evidence of planning, ideology, and pre-operation surveillance would tend to show a person's intentions. Although a true threat does not require proof that the person intended to carry out the threat, *Virginia v. Black*, 538 U.S. at 359-360, here such proof would tend to prove that Martinez acted intentionally and knowingly.

Similarly, under a commonsense approach, evidence of ideology would tend to show that Martinez (1) understood the current meaning of the Molon Labe and intended to use the phrase consistent with its common usage, and (2) actually believed that he could kill law enforcement officers who acted unlawfully.

And under the common-sense test, the affidavit did not need to state who planned what or describe the ideology or the operation subject to surveillance. The affidavit provided enough information to establish probable cause for these items and guide the seizing police officers conducting the searches.

Martinez also argues the affidavit was inadequate because it failed to specify how evidence of maps, drawings, concert tickets, hotel room reservations and receipts, and notes might constitute evidence of the crimes. Here again Martinez wrongly applies a technical analysis. Common sense says that evidence of maps, drawings, and notes are tools for planning and surveillance. Concert tickets and hotel room reservations and receipts were not likely found in the search, but if they were, they could be severed from the

warrant. Under the severance doctrine, courts can "strike from a warrant those portions that are invalid and preserve those portions that satisfy the Fourth Amendment. Only those articles seized pursuant to the invalid portions need be suppressed." *United States v. Flores*, 802 F.3d 1028, 1045-46 (9th Cir. 2015) (quoting *United States v. Gomez–Soto*, 723 F.2d 649, 654 (9th Cir. 1984)).

### c.    Evidence of motive and identity of the perpetrator

Martinez argues that the affidavit did not establish probable cause to search for evidence of the motive and identity of the perpetrator. He seems to argue that the descriptions of motive and identity were so ambiguous that they enabled LVMPD  to search for "evidence of other unspecified crimes committed by other, unknown individuals." ECF No. 36 at 20. If so, he reads too much into the warrant. A fair reading of the warrant limits seizure to evidence related to Martinez's motive to threaten Mead and Dickerson and to the identity of the persons posting the threats. It does not authorize wholesale rummaging.

### 2.    The warrants set forth objective standards to guide the search.

A warrant is adequate if it is "sufficiently specific to 'reasonably guide the officer in avoiding seizure of protected property' and to allow judicial review 'to determine whether the instructions were followed and legitimate property and privacy interests were protected.'" *Millender v. Cty of Los Angeles*, 620 F.3d 1016, 1025 (9th Cir. 2010) (quoting *United States v. Hillyard*, 677 F.2d 1336, 1340 (9th Cir. 1982)). "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927).

1   "The specificity required in a warrant varies depending on the circumstances of the

2   case and the types of items involved." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir.

3   1986). Generally, where specific information is available to guide a search, it should be

4   included. *Id.* at 964. But "[r]eference to a specific illegal activity can, in appropriate cases,

5   provide substantive guidance" for the searching officers. *Id.* "Reference to criminal conduct

6   satisfies particularity requirement where nature of crime permits ready identification of its

7   instrumentalities." *Id.* (citing 2 W. LaFave, *Search and Seizure* § 4.6, at 104-05 (1978).

8   Examples include prostitution, narcotics sales, extortionate credit transactions in addition

9   to list four statutes, loan sharking and gambling. *Id.* at 964-965. *See also United States v.*

10  *Turner*, 2022 WL 195083, at *6 (D. Nev. Jan. 21, 2022) ("The Ninth Circuit has found that

11  'reference to the "specific illegal activity" at issue would "provide substantive guidance for

12  the [officers'] exercise of discretion in executing the warrant."'" *United States v. Martinez*,

13  2020 WL 3050767  at *6 (N.D. Cal. June 8, 2020)(quoting *United States v. Spilotro*, 800 F.2d

14  959, 964 (9th Cir. 1986)).

15      The Ninth Circuit "consider[s] an affidavit to be part of a warrant, and therefore

16  potentially curative of any defects, 'only if (1) the warrant expressly incorporated the

17  affidavit by reference and (2) the affidavit is either attached physically to the warrant or at

18  least accompanies the warrant while agents execute the search.'" *United States v. SDI Future*

19  *Health, Inc.,* 568 F.3d 684,. 699 (9th Cir. 2009) (quoting *United States v. Kow*, 58 F.3d 423,

20  429 n.3 (9th Cir. 1995)).

21      The Residential Warrant incorporated the affidavit, ECF No. 36-3 at 28, and Packe

22  took the affidavit and the warrant to the residence. Exhibit B, Declaration of Ashton Packe.

23

24

The Residential Warrant provided objective standards for the search. It described the specific illegal activities by naming the crimes and provided details about Martinez criminal behavior. It also limited the non-firearm items to evidence to discreet categories: (1) evidence of planning, ideology, and surveillance; (2) evidence of motive and identity of the perpetrator; and (3) evidence of the identity of the person controlling the premises or items to be seized. ECF 36-3 at 28-29.  And the Residential Warrant provided examples of planning and surveillance evidence and of identity of the person controlling the premises. *Id.*

Martinez claims that the warrant effectively allowed the officers to seize items unrelated to the Target Crimes. To that end, he says the warrant allowed officers to seize "photographs and undeveloped film, insurance policies and letters, address and telephone records, diaries, governmental notices, whether such items were typed or stored on computer disc . . . [and] objects which bear a person's name, phone number or address." ECF No. 36 at 21. However, Martinez quotes the warrant out of context. The warrant authorized seizure of those times but only to the extent they  tended "to establish the identity of the person in control of the premises." *Id.* at 5.

Separately, the generic descriptions of firearms were sufficient because no further information was available. Martinez never indicated the type of weapon(s) possessed.

### 3.   The items could not have been described with more particularity in light of the information available.

Martinez contends that the affidavit should have specifically restricted the seizure of maps, photographs, notes, and diaries to those related to the stalking or harassment of Mead and Dickerson. ECF 36 at 21. Here again Martinez improperly requires hyper

technicality. The Residential Warrant was sufficient because it described the crimes, Martinez's behavior, and the items to be seized. This information appropriately limited the search to evidence for stalking and harassment involving Mead and Dickerson.

**F.     The Vehicle Warrant Established Probable Cause to Search the Vehicles.**

Martinez argues that the Vehicle Warrant was invalid because it lacked probable cause and that evidence seized from the warrant is the fruits of the poisonous tree. ECF No. 36 at 22. He makes several arguments regarding probable cause, but none have merit.

First, he argues that the vehicle affidavit did not provide probable cause to search for non-firearm evidence because the facts in the affidavit addressed the firearm crime, not the stalking and harassment crimes. Furthermore, the vehicle affidavit incorporated the residential affidavit, ECF No. 36-4 at 4, and listed all the Target Crimes for which evidence could be seized. Consequently, the Vehicle Warrant authorized a search for evidence of all the Target Crimes.

Next, he argues probable cause did not connect him to the Nissan. He says that no evidence showed that he owned the Nissan or that he was observed carrying anything from the residence to the Nissan. But the test is not whether Martinez owned the Nissan or was seen carrying items to the Nissan; rather, the test is "whether there is a fair probability that contraband or evidence of a crime would be found in a particular place.'" *United States v. Ruiz,* 758 F.3d 1144, 1148 (9th Cir. 2014) (internal citations and quotations omitted); *United States v. Sembrano,* 2020 WL 6684865 (N.D. Ca. November 12, 2020) (holding that "[a] suspect need not live at a residence for police to have probable cause to search that residence"). Here, the totality of the circumstances established probable cause that evidence was located in the vehicles.

1    Next, Martinez argues that probable cause did not exist to search the Nissan

2  because Estrada said he owned the firearm. But Det. Jacob did not have to accept Estrada's

3  statement because his training and experience taught him that individuals living with

4  prohibited people commonly conceal firearms for those prohibited people.

5    Finally, he argues that evidence seized from the vehicles should be suppressed as the

6  fruit of the poisonous tree. He reasons that the Vehicle Warrant was based on information

7  obtained from the presence of officers at the residence where an invalid warrant was

8  served. But the Residential Warrant was not invalid, and officers gathered substantial

9  evidence from the residence before the Residential Warrant was executed. In particular,

10  even before the Residential Warrant was executed, surveillance saw Estrada carry the

11  firearm case from the residence to the Nissan and Martinez driving away from the

12  residence in the Expedition. ECF 36-4 at 4. Consequently, the fruit-of-the-poisonous-tree

13  doctrine does not apply here because independent information provided probable cause to

14  search the vehicles. *See Murray v. United States*, 487 U.S. at 537-538. Martinez provides no

15  legal authority for his position that observations made before a search warrant is executed

16  can be the fruit of the poisonous tree.

17  **G.    The Phone Warrant Affidavit Established Probable Cause.**

18    Martinez argues that his phone seized from the Expedition should be suppressed as

19  fruit of the poisonous tree. ECF 36 at 24. He argues that the officers found the phone while

20  they were arresting him on an invalid arrest warrant. *Id.* He argues that the arrest warrant

21  was invalid because probable cause failed to establish that he committed the Target Crimes.

22  *Id.* But the probable cause for arrest warrant was the same as the probable cause for the

23  Residential Warrant, and probable cause existed for both.

24

Martinez also argues that the Phone Warrant was overbroad because it failed to adequately describe the items to be seized. *Id.* at 25. But the warrant set objective standards. It described the statutes violated, the items to be seized, and the time frame (February 17-19, 2021) that the criminal activity occurred. The warrant limited the digital evidence to a narrow category of information – data "which may constitute evidence of Joshua Martinez' involvement in the planning or commission" of the Target Crimes. ECF No. 36-8 at 28.

Additionally, the Phone Warrant incorporated the affidavit, ECF No. 36-8 at 28, and the affidavit and the warrant were sent to the examiner who extracted items from the phone. Exhibit C, *see* Section labeled "REQUIRED DOCUMENTS." The affidavit provided a detailed statement about Martinez's conduct which could further guide the search. The Phone Warrant set appropriate standards.

**H.    The February Facebook Warrant Affidavit Established Probable Cause.**

Martinez argues that the February Facebook Warrant lacked probable cause. ECF No. 36. He does not develop this argument. He also argues that the evidence from February Facebook Warrant should be suppressed because it relied on information obtained from the Residential Warrant. Again, the Residential Warrant was valid. And so was the February Facebook Warrant because it contained essentially the same probable cause statements provided in the Residential Warrant, plus some information from the search of residence. The February Facebook Warrant was supported by probable cause.

**I.    Even If Probable Cause Did Not Support the Warrants, Suppression Is Unwarranted Because the Officers Relied on the Warrants in Good Faith.**

Even if the warrants lacked probable cause, the seized evidence should not be suppressed because the seizing officers acted in good faith. They would have acted "in

objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon,* 468 U.S. 897, 922 (1984). "The government bears the burden of proving that reliance upon the warrant was objectively reasonable." *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995). Only in limited situations the good-faith exception does not apply, none of which apply here:

> (1) where the affiant recklessly or knowingly placed false information in the affidavit that misled the issuing judge; (2) where the judge wholly abandon[s] his [or her] judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized –that the executing officers cannot reasonably presume it to be valid.

*United States v. Underwood,* 725F.3d 1076, 1085 (9th Cir. 2013)(internal quotations omitted).

Reliance on the warrants was objectively reasonable. Given the nature of the charges and the evidence used to support of probable cause, a reasonable officer could believe that probable cause existed to believe that crimes were committed, and that evidence of the crimes would be found in the specified locations. Additionally, a reasonable officer would also conclude that the warrants adequately specified the items to be seized. Given the totality of the circumstances, the generic descriptions of firearms and the examples of firearm-related items would have sufficiently guided their searches for firearms and the descriptions of the other items for their searches.

Accordingly, if the Court needed to consider whether the good-faith doctrine applies, the government has met its burden – it has shown that reliance on the warrants was objectively reasonable.

## IV.    CONCLUSION

Based on the foregoing, Martinez's motion to suppress the search warrants should be denied.

Respectfully submitted.

JASON M. FRIERSON
United States Attorney

*Daniel R. Schiess*

_____

DANIEL R. SCHIESS
Assistant United States Attorney