RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
JOANNE L. DIAMOND
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Joanne_Diamond@fd.org

Attorney for Joshua A. Martinez

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JOSHUA A. MARTINEZ,<br><br>　　　　　Defendant. | Case No. 2:21-cr-00219-APG-DJA<br><br>**Reply in Support of Motion to Dismiss Indictment**[1] |

The Supreme Court changed the entire landscape of Second Amendment challenges when it issued *New York State Rifle & Pistol Assn, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *See* ECF No. 39 at 4-12. For example, applying *Bruen*'s analysis, the Ninth Circuit recently vacated and remanded a civil case challenging gun regulations in California. *Jones v. Bonta,* 47 F.4th 1124, 1125 (9th Cir. 2022) (vacating the district court's denial of a preliminary injunction against regulations restricting hunting rifle and semiautomatic centerfire rifles

---

[1] This reply is timely filed. ECF No. 35. Mr. Martinez withdraws his request for an evidentiary hearing on this motion, as the constitutional inquiry at issue can be conducted based on the filings.

for young adults, and remanding "for further proceedings consistent with the United States Supreme Court's decision in [*Bruen*]"). Last month, a district court in the Southern District of West Virginia invalidated 18 U.S.C. § 922(k) under the Second Amendment, finding the government did not carry its burden of showing a tradition of laws that required firearms to bear serial numbers. *United States v. Randy Price*, 2:22-cr-00097, ECF No. 48 (S.D.W. Va. Oct. 12, 2022). And the Tennessee Court of Appeals held a public housing authority may not require tenants to contractually waive their right to possess firearms in their homes because there is no historical tradition of treating public housing developments as "sensitive places." *Columbia Housing & Redevelopment Corp. v. Braden*, 2022 WL 7275671 (Tenn. Ct. App. Oct. 13, 2022). Here, too, the government has failed to meet its burden of showing a robust tradition of firearm regulation disarming convicted felons at the time of the Founding. This Court should accordingly dismiss the indictment.

**I.    The Second Amendment does not protect only law-abiding citizens.**

Prior to *Bruen*, to determine whether government action infringed on the Second Amendment, the Ninth Circuit and other federal courts of appeals applied a two-step test. *See United States v. Chovan*, 735 F.3d 1127, 1134–37 (9th Cir. 2013) (discussing cases); *see* ECF No. 39 at 4-5. Under the first step, if the challenged law burdened conduct covered by the Second Amendment, courts moved to the second step—applying an appropriate form of means-end scrutiny. *Id*. In *District of Columbia. v. Heller*, 554 U.S. 570, 629 n.27 (2008), the Supreme Court expressly rejected rational basis review at step two; thus, to avoid using strict scrutiny, courts of appeals utilized a "law-abiding citizen" construct. The "law-abiding citizen" construct was an integral and inseparable component of the

post-*Heller* Second Amendment means-end scrutiny analysis, but *only* because the courts of appeals made it so. It was never a requirement in the Amendment's actual text, nor was it expressly created by *Heller*.

*Bruen* got rid of the second step, means-ends scrutiny analysis, and jettisoned with it artificial constraints of "core" fundamental Second Amendment protections on certain classes of citizens. *See* ECF No. 39 at 5-6. Rather than asking whether any given individual deserves the Second Amendment's protections, *Bruen* made clear the inquiry must instead focus solely on conduct. And "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126.

Justice Thomas's majority opinion repeatedly emphasizes the particular conduct at issue as central to the first *Bruen* prong of whether Second Amendment protections apply. *Bruen*, 142 S. Ct. at 2126. Whether the Second Amendment's presumptive application can be prohibited based on status then becomes a function of the second *Bruen* prong—within the historical analysis the government now has the burden of carrying. *Id.*

Here, Mr. Martinez's conduct falls within the plain text of the Second Amendment and is thus presumptively entitled to constitutional protection. There is no dispute the gun seized was "arms" for Second Amendment purposes. *See United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) ("As there is no dispute the Remington 45 caliber handgun Mr. Carrero was carrying was an 'arm,' the Second Amendment's plain text covers, and the Constitution presumptively protects, Mr. Carrero's conduct"). And Mr. Martinez is one of "the people" under the Second Amendment. *See, e.g.*, *Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (applying the presumption of consistent usage and declining to carve out felons from the scope of the Second

3

Amendment's protection of "the people") (citing *United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022) ("[C]onvicted felons fall within 'the people' as contemplated by the First and Fourth Amendment")).

Rather than directly address and apply *Bruen's* refined standard of review to § 922(g)(1), the government argues, as a non-law-abiding citizen, Mr. Martinez is too unvirtuous to warrant protections afforded by the Second Amendment. *See* ECF No. 42 at 8-9. The government's position is wholly inconsistent with *Bruen*.

First, the government misrepresents *Bruen*. The government claims *Bruen* "reinforced" that the Second Amendment protects "'law-abiding' citizens only." ECF No. 42 at 6. But the petitioners in *Bruen* described *themselves* as law-abiding "in the pleadings below," so the Supreme Court decided the case on that assumption. *Bruen*, 142 S. Ct. at 2124-25. Second Amendment protections for non-law-abiding people were not at issue in *Bruen*, and thus the Court had no occasion to make any such holding. *See United States v. Pepe*, 895 F.3d 679, 688 (9th Cir. 2018) (reiterating that "cases are not precedential for propositions not considered").

Nowhere in the opinion does the Court say "only" law-abiding citizens have the right to bear arms. If the government could quote language to that effect, it would have done so. Instead, the government rests its argument on the incorrect premise that Justice Kavanaugh's concurrence is binding under the *Marks* rule. ECF No. 42 at 6 n.28 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)). But Justice Kavanaugh joined the *Bruen* majority opinion *in full*. The *Marks* rule is thus inapplicable.

Citing Justice Kavanaugh's concurrence, the government claims *Bruen*'s "unequivocal holding" is that the Court did not cast doubt on felon-disarmament

4

laws. ECF No. 42 at 8 n.38; *see also id.* at 12 n.39. The government also cites Justice Alito's concurrence. *Id.* But concurrences are not holdings. And not only did Justice Alito say nothing about felons, he expressly stated: "Our holding *decides nothing* about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Bruen*, 142 S. Ct. at 2157 (Alito, J. concurring) (emphasis added).

Second, the government makes a similar misrepresentation about *Heller*, claiming the Court "defined the right protected by the Second Amendment as the right of 'law-abiding, responsible citizens' to keep and bear arms." ECF No. 42 at 7; *see also* ECF No. 42 at 8 ("The lead opinion repeatedly described those who fall under the Second Amendment's protection as limited to 'law-abiding' citizens."). In fact, *Heller* expressly left "to future evaluation" the question of whether other people receive Second Amendment protection. *Heller*, 554 U.S. at 635. *Heller* said "the people" unambiguously refers to all members of the community, "not an unspecified subset." 554 U.S. at 580. *Heller* also said "the people" is a "term of art" that has a uniform meaning in the First, Second, Fourth, and Ninth Amendments. *Id.* It "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id. Heller* further said the right protected by the Second Amendment "belongs to all Americans." *Id.* at 581.

Despite his past convictions, Mr. Martinez is undoubtedly part of the "national community," just as he is part of "all Americans." Were he excluded, that would mean "the people" as used in the Second Amendment refers to "an unspecified subset" of people—a proposition *Heller* rejected. If the government is correct that breaking the law strips citizens of their Second Amendment rights, then breaking the law would also strip citizens of their First and Fourth

Amendment rights. Yet a felony conviction does not result in a loss of the rights to free speech or from unlawful searches and seizures. Mr. Martinez, and his conduct, both fall within the plain text of the Second Amendment such that his conduct is presumptively protected by the Constitution. *See, e.g., United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (recognizing that even "dangerous felons" are indisputably part of "the people"); *United States v. Meza-Rodriguez*, 798 F.3d 664, 670–71 (7th Cir. 2015) (holding that "the Second Amendment protects unauthorized non-U.S. citizens within our borders").

## II. The government failed to meet its burden to "affirmatively prove" § 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

In his motion, Mr. Martinez explained why the government cannot show a historical tradition of restricting people with felonies from possessing firearms. For example, he explained state ratification conventions are unpersuasive evidence, ECF No. 39 at 19-22, yet the government relies on those conventions without acknowledging Mr. Martinez's counterarguments on the issue. ECF No. 42 at 12-14. The government claims the constitutionality of disarming convicted felons is supported by the historic tradition of disarming "unvirtuous" groups of people, ECF No. 42 at 11 and n.53, but fails to address Mr. Martinez's argument that there is *no evidence* linking the arms right to a person's virtue. *See* ECF No. 39 at 22-24. Similarly, the government fails to address Mr. Martinez's argument that, to the extent history suggests the Framers stripped the "unvirtuous" of any rights, it was *civic* rights (such as jury service or voting), not *individual* rights (like freedom of speech). *See id.*

The government otherwise fails to meet its burden to avoid dismissal. First, it fails to identify a robust tradition of "distinctly similar" historical

6

regulation. Second, its attempt to define the relevant historical tradition as disarming "unvirtuous" groups is a misapplication of *Bruen*.

### A. The government fails to identify a robust tradition of "distinctly similar" historical regulation.

Because the Second Amendment's "plain text" does not differentiate between convicted felons and other members of "the people," a total prohibition on firearm possession by convicted felons presumptively violates the Second Amendment. To rebut the presumption of unconstitutionality, *Bruen* held "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." 142 S. Ct. at 2126. This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id*. at 2131-32. If "no such tradition" exists, then the challenged statute is unconstitutional. *Id*. at 2132

*Bruen* provided guidance on conducting the required historical analysis. The Court drew a distinction between two types of regulation, explaining that in "some cases" a challenged regulation "addresses a general societal problem that has persisted since the 18th century." 142 S. Ct. at 2131. For this first type of regulation, the government must point to a robust tradition of "distinctly similar" historical regulations. *Id*. The Court then explained that in "other cases," a statute "implicat[es] unprecedented societal concerns or dramatic technological changes" or addresses a problem that was "unimaginable at the founding." *Id*. at 2132. For this second type of regulation the government can use "analogical reasoning," which involves the "relevantly similar" inquiry. *Id*. Thus, *Bruen*

clearly established dual-track review of historical evidence, with the proper track depending on the type of problem a statute is meant to address. In either case, the burden is on the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Here, the government has failed to meet its burden.

Section 922(g)(1) implicates a type one regulation because the problem to which § 922(g)(1) is addressed—the "risk" presented by convicted felons possessing arms—existed before, during, and after the Founding.[2] That means, in § 922(g)(1) cases, courts must review the government's evidence under the "distinctly similar" rubric and *not* the "relevantly similar" rubric. The distinction is important. By the plain meaning of the words, as well as their constitutional import, the former standard is harder to satisfy than the latter: Webster's defines "distinct" as "presenting a *clear unmistakable impression*," "*readily and unmistakably apprehended*;"[3] it's definition of "relevant" is "having significant and demonstrable bearing on the matter at hand."[4]

The government's response makes no attempt to meet the "distinctly similar" test and instead tries to carry its burden through analogical reasoning,

---

[2] As James Wilson, a leading Founder, told a Virginia grand jury in 1791, "how few are the capital crimes, known to the laws of the United States, compared with those known to the laws of England!" John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment*, p. 52, Northeastern University Press (2012) (citation omitted).

[3] "Distinct." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/distinct. Accessed 14 Oct. 2022. (emphasis added).

[4] "Relevant." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/relevant. Accessed 14 Oct. 2022.

i.e., the "relevantly similar" test. *See, e.g.*, ECF No. 42 at 10, 12. For example, the government analogizes § 922(g)(1) to colonial laws disarming people who failed to swear allegiance. *See* ECF No. 42 at 14. The government specifically relies on colonial laws from Connecticut, Pennsylvania, and Massachusetts. ECF No. 42 at 14 n.68. But the Court in *Bruen* "doubt[ed]" that regulations from three out of the thirteen colonies "could suffice to show a tradition of public-carry regulation." 142 S. Ct. at 2142. And such laws are not "distinctly similar" to § 922(g)(1).

Even if the "relevantly similar" test applied, the laws are not comparably justified. The allegiance laws were enacted to prevent armed rebellion against the state, not to control interpersonal violence. Although it does not say so explicitly, *Bruen* seems to discount laws that were passed during times of revolutionary unrest. *See id*. at 2139 (noting "respondents and their *amici* point to several medieval English regulations," the most prominent of which was "passed shortly after Edward II was deposed by force of arms and his son, Edward III, took the throne of a kingdom where 'tendency to turmoil and rebellion was everywhere apparent throughout the realm,'" and '[b]ands of malefactors, knights as well as those of lesser degree, harried the country, committing assaults and murders,' prompted by a more general 'spirit of insubordination' that led to a 'decay in English national life.'" (citations and quotation marks omitted) (alteration in original)).

In sum, the only way the government can bear its burden for a type one regulation like § 922(g)(1) is by showing a "well-established and representative" tradition of regulations that are "distinctly similar" to § 922(g)(1). Using the "relevantly similar" test to defend a type one regulation is a clear misapplication of *Bruen*. And the government is not alone in its error. The district court cases rejecting *Bruen* challenges to § 922(g)(1) cited by the government similarly

misapplied *Bruen*. *See* ECF No. 42 at 13 n.64. A proper application of the "distinctly similar" test compels the conclusion that § 922(g)(1) is unconstitutional.

### B. The government's attempt to define the relevant historical tradition as disarming "unvirtuous" groups is a misapplication of *Bruen*.

*Bruen* indicates that if considering carving out exceptions to "the Second Amendment's unqualified command," 142 S. Ct. at 2126, courts must proceed cautiously, defining those exceptions as narrowly and concretely as possible. To attempt to support its proper-cause requirement in *Bruen*, New York relied on a number of English and early American firearms regulations that, it asserted, demonstrated a general governmental power to regulate the public carrying of firearms. The Court, however, refused to treat those regulations as more than the sum of their parts. Although New York's cited regulations did suggest the constitutionality of certain narrow, "well-defined" public-carry restrictions, the Court concluded they did not permit "broadly prohibiting" public carry in whatever way a legislature finds appropriate. *Id.* at 2138.

The Court made the same point in its discussion of "sensitive places" where firearms may be "altogether prohibited." *Id.* at 2133. New York argued the sensitive-places doctrine should cover "all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available.'" *Id.* But the Court rejected that conception of the term. "Put simply," the Court explained, "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2134. Expanding "sensitive places" in that way "defines the category of

10

'sensitive places' far too broadly." *Id.* According to the Court, such an understanding of sensitive places "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id.* Exceptions to "the Second Amendment's unqualified command," *id.* at 2130, must be defined more narrowly than that.

The Court explained that this minimalist approach to recognizing Second Amendment exceptions "accords with how we protect other constitutional rights," in particular "the freedom of speech in the First Amendment." *Id.* And the Court's First Amendment cases confirm that, when "mark[ing] off new categories" of constitutionally unprotected conduct, courts should operate at the lowest possible level of generality. *Nat'l Inst. of Fam. & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (*NIFLA*).

"As a general matter," the Court has said, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010). Nevertheless, "[f]rom 1791 to the present, . . . the First Amendment has permitted restrictions upon the content" of certain categories of "unprotected speech" that are "outside the reach of that Amendment altogether." *Id.* at 468–69. But these categories—e.g., fraud, obscenity, incitement, fighting words—are "well-defined and narrowly limited." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 791 (2011). They exist only in "a few limited areas." *Stevens*, 559 U.S. at 468. If the government wants to add "new categories of unprotected speech . . . to the list," it must adduce "persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription." *Brown*, 564 U.S. at 791–92. And, critically, the Court demands precision when delineating categories of unprotected speech.

In *United States v. Alvarez*, 567 U.S. 709, 713–15 (2012), for instance, the Court considered a First Amendment challenge to the Stolen Valor Act, which criminalized falsely claiming receipt of military decorations or medals. The government argued "false statements" constitute a class of categorically unprotected speech, just like fraud, obscenity, defamation, and fighting words. *Id.* at 718. To support that view, the government identified "three examples of regulations on false speech that courts generally have found permissible": prohibitions on perjury, making false statements to government officials, and making the false representation that one is speaking as a government official. *Id.* at 720. From these isolated examples, the government would have extrapolated a general rule "that *all* proscriptions of false statements are exempt from exacting First Amendment scrutiny." *Id.* (emphasis added).

The Court rejected that argument. It held the government's three examples did "not lead to the broader proposition that false statements are unprotected when made to any person, at any time, in any context." *Id.* From the fact that three types of false statements are proscribable, it simply does not follow that *all* "false speech should be in a general category that is presumptively unprotected." *Id.* at 722. Such a rule, the Court warned, "has no clear limiting principle" and would "give government a broad censorial power" inconsistent with the First Amendment. *Id.* at 723; *see also NIFLA*, 138 S. Ct. at 2371–74 (rejecting government's argument that, because Court had previously held two particular kinds of "professional speech" enjoy diminished First Amendment protection, *all* "professional speech" is subject to that lower standard). These First Amendment cases, as well as *Bruen* itself, doom the government's effort to carve out Second Amendment exceptions for any group labeled "unvirtuous."

12

The Second Amendment exceptions that the government's approach would produce are grossly overbroad. The category of "unvirtuous" persons is neither "well-defined," *Bruen*, 142 S. Ct. at 2156, nor "narrowly limited," *Brown*, 564 U.S. at 791. "Unvirtuous" is an elastic, malleable term that, in the wrong hands, could be applied to virtually any group of people—and one that the government could therefore use to "shoehorn" historically protected groups into unprotected status. *Brown*, 564 U.S. at 793. If an open-ended catchall term like "unvirtuous" could justify disarmament, legislatures would be free to "eviscerate" the right to keep and bear arms. *Bruen*, 142 S. Ct. at 2134.

The "unvirtuous" label is so capacious, so pliant, that the government might use the "virtuousness" theory to disarm a seemingly endless number of groups, from serial liars to those who cheat on their spouses to anyone who fails to display "prudence," "fortitude," and charity."[5] "Virtue" is about as expansive, ill-defined a basis for limiting constitutional rights as it's possible to imagine. That term not only lacks a "*clear* limiting principle," it lacks any limiting principle at all. *Alvarez*, 567 U.S. at 723 (emphasis added).

What's more, applying the "unvirtuous" label would require precisely the "judge-empowering interest-balancing inquiry" that *Bruen* forbids. 142 S. Ct. at 2129. If courts are to avoid treating the right to bear arms as "a second-class right," *id*. at 2156, they will have to scrutinize legislatures' judgements: Is it reasonable to conclude that adulterers are unvirtuous? What about well-known

---

[5] *See* "Cardinal virtues," Wikipedia, *available at* https://en.wikipedia.org/wiki/Cardinal_virtues (last visited Oct. 10, 2022) (listing the four cardinal virtues identified by "both classical philosophy and Christian theology," as well as "the theological virtues").

13

liars? Or unwed mothers? How important is it, really, to prevent guns from falling into the hands of someone who is imprudent and uncharitable?

But this is means-ends balancing all over again—the mode of analysis *Bruen* repudiated. The only way to avoid getting sucked back into that thicket is to conduct the analysis at a lower, more administrable level of generality that is tightly tethered to the historical record. Instead of asking whether founding-era laws prohibited firearm possession by "unvirtuous" people—a category broad enough to sweep in almost anyone—the Court must ask whether such laws, like § 922(g)(1), denied firearms to those whose prior commission of a crime suggested they might pose a danger to others if armed. Any other approach risks embroiling courts in "independent means-end scrutiny under the guise" of a historical comparison. *Id.* at 2133 n.7.

/ / /

/ / /

/ / /

14


### III. Conclusion

Felon-disarmament laws were simply unknown to the founding generation. There was no "historical tradition" in 1791 of barring felons from possessing firearms, and more recent legislative enactments cannot supplant the understanding of the right to keep and bear arms that prevailed when the Second Amendment was enacted. The government has failed to carry its burden and make the necessary showing to rebut the presumption of unconstitutionality of § 922(g)(1) under *Bruen*. Because § 922(g)(1) violates protections afforded to Mr. Martinez by the Second Amendment, this Court should grant his motion to dismiss.

Dated: November 3, 2022.

<div style="text-align:right">

RENE L. VALLADARES
Federal Public Defender

By: */s/ Joanne L. Diamond*
JOANNE L. DIAMOND
Assistant Federal Public Defender
Counsel for Joshua A. Martinez

</div>