RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
JOANNE L. DIAMOND
Assistant Federal Public Defender
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Joanne_Diamond@fd.org

Attorney for Joshua Martinez

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-cr-00219-APG-DJA |
| Plaintiff, | |
| v. | **Defendant's Sentencing Memorandum and Objections to the Presentence Report[1]** |
| JOSHUA MARTINEZ, | |
| Defendant. | |

Joshua "Josh" Martinez will soon appear before this Court for sentencing after pleading guilty to felon in possession of a firearm. But Josh is more than a "felon." He is a partner, a father, and a farmer: roles he has embraced and excelled at while on intensive pretrial supervision for the past three years. He is not the man he was when the government brought this case. The goals of sentencing have been met; there is no further need to punish him or protect society from him. Josh asks this Court to sentence him to credit for time served and one year of supervised release.

---

[1] This memorandum is timely filed.

Josh supports this memorandum with a short mitigation video. A hard copy of the video, Exhibit A, will be hand-delivered to the Court and government counsel upon filing this memorandum.

## I.    Background

On August 17, 2023, pursuant to an agreement with the government, Josh pled guilty to count two of the indictment, charging him with felon in possession of a firearm. ECF No. 74 at 5, ¶¶2-3. As the plea agreement reflects, Josh agrees that, on or about February 19, 2021, he knowingly possessed a Century Arms rifle, knowing he had previously been convicted of a felony offense and could no longer possess a firearm. ECF No. 72 at 6. Before his 2019 felony conviction, Josh owned the firearm legally. *See* Exhibit B, Certified Firearms Trace Summary for Century Arms rifle, serial number RAS47026873. Josh did not use the firearm to commit another crime: it was recovered from the trunk of his brother's vehicle, parked outside the family home. *See* ECF No. 36-4 at 4, 9.

Probation correctly calculated Josh's base offense level as 20 because the offense involved a semiautomatic firearm capable of accepting a large capacity magazine and Josh is a prohibited person. ECF No. 74 at 7, ¶15. But Josh objects to the two-level increase for 3-7 guns. *Id.* at ¶16; *see also* ECF No. 74 at 34, *Objection #1.* Josh pleaded guilty to possessing one firearm. Pursuant to the plea agreement, the government will not present evidence suggesting Josh possessed any of the firearms found in the home. *See* ECF No. 72 at 7.

Josh received a three-level reduction for accepting responsibility. ECF No. 74 at 7, ¶¶22-23. Probation calculated the total offense level as 19. *Id.* at ¶24. The correct total offense level is 17. The government will recommend that the Court sentence Josh at the low end of the advisory Guidelines range. ECF No. 72

at 9. Josh is free to argue for a downward variance pursuant to 18 U.S.C. § 3553. *Id.* Josh has six criminal history points, placing him in criminal history category III. ECF No. 74 at 12, ¶¶35-36. With a total offense level of 17 and criminal history category III, Josh's Guidelines' range is 30-37 months.

## II.    Argument

### A.    The 18 U.S.C. §3553(a) factors support a sentence of credit for time served.

#### 1.    This Court should vary down in recognition of Josh's three years on intensive pretrial release, without incident.

Josh was released on bond on September 13, 2021. ECF No. 13. His conditions were, and remain, intensive. He has been on home detention for the entire time. *Id.* at 5. He has an ankle monitor. *Id.* He cannot use the internet except specific, approved websites for employment purposes only. *Id.* He cannot travel to Las Vegas unless it is related to his case or his children. *Id.* at 6. He cannot travel beyond a six-mile radius of his home. *Id.* He is allowed outside to care for his animals only at approved times. *Id.*

For much of this time, Josh was also on intensive pretrial supervision in state court: home detention, movement restrictions, and a second ankle monitor. Josh has consistently complied with all his bond conditions in both jurisdictions. Based on his record of compliance, his state conditions were lifted over a year ago; his one remaining condition is to obey his federal conditions. The undersigned spoke with Josh's former federal probation officer, Samira Barlow, and current officer, Justin Lauby. Both confirmed he has been compliant and caused them no issues.

3

It is difficult to convey how challenging it has been for Josh to live under these restrictions. In spring of 2023, Josh called the undersigned to say he couldn't do it anymore; he was going to turn himself in to pretrial detention. With counseling and support from the undersigned and Officer Barlow, Josh decided to keep going. Fortunately, his pretrial conditions included participation in mental health treatment, ECF No. 13 at 4, and he was able to reach out to his therapist for additional support.

Josh suffers from Major Depressive Disorder, Generalized Anxiety Disorder, and Post-Traumatic Stress Disorder. *See* Sealed Exhibit C, Letter from David Taylor, LCSW; Sealed Exhibit D, Virgin Valley Mental Health Records. Many of Josh's symptoms stem from his time incarcerated, particularly time spent in solitary confinement. Ex. C. Josh blamed Detective Kenneth Mead for his placement in solitary confinement. His near obsession with Detective Mead— and, by extension, Deputy District Attorney Michael Dickerson—is intertwined with the trauma he experienced in solitary confinement. Whether Detective Mead was truly involved in Josh's placement in solitary is irrelevant to its impact on Josh. As his therapist, David Taylor, explains hypervigilance and paranoia are symptoms of PTSD. Ex. C. These symptoms are evidenced throughout Josh's social media posts. *See* ECF No. 74 at 11, ¶33; 14, ¶42; 17, ¶46; 18, ¶47.

Josh has made great strides through his therapy appointments. He first met with his therapist in March 2023. Josh acknowledged daily struggles with depression and anxiety and manifested "a desire to get better." Ex. D at 1. In April, Josh "discussed how home confinement has been effecting his moods and overall thoughts" and reported "increased depressive thoughts due to his limited mobility." *Id*. at 4. Josh "was able to express how he was feeling as well as

4

observe how these stressors were effecting his family." *Id.* In May, Josh reported "stress from the unknown about his future" given his then-pending charges "and how that effects current life planning." *Id.* at 9. Josh was "trying to stay focused on what he can do and not on what he cannot control." *Id.* In July, Josh "processed stress from ongoing court issues." *Id.* at 13. Josh "reported he is planning to take a plea deal" and "processed his feelings about this choice." *Id.* Josh was "motivated and happy about the plea, but [ ] still wary of the end [ ] outcomes." *Id.*

In August 2023, Josh "discussed [his] emotions at [his] plea hearing as well as worries about it all coming together at sentencing" as well as his "ongoing trauma memories about this process and how it is effecting him today in his emotions." *Id.* at 17. Josh "expressed avoidant behavior of memories from his court proceedings as well as his solitary confinement while incarcerated. He report[ed] nightmares and flashbacks." *Id.* In October, Josh was still experiencing "nightmares and flashbacks to [his] time in solitary confinement" and an increase in "stress and past trauma memories . . . as [his] court dates near[s]." *Id.* at 25.

By January 2024, Josh was "visibly relaxed" and "spoke of more steady feelings of peace" since his decision to plead guilty. *Id.* at 33. He continues to experience ups and downs as he processes the stresses of his court proceedings, farming, and family, but critically Josh has learned how to "identify[] his emotions" and "work[] to find ways to address them." *Id.* at 48.

Josh's stressors over the past three years are thus well-documented. Despite them, he used his time on supervision to build a family, a home, and a business, creating a level of stability for his future he never could have imagined.

### 2.  This Court should vary down in recognition of the new life Josh has made.

At the time of the offense conduct in this case, Josh was living between his dad's house in Las Vegas and family land in Moapa. The Moapa property consisted of dilapidated buildings, junk cars, and trash:








Josh was not romantically involved with Lauren, the mother of his youngest children. And most of his time was spent producing content for social media and posting about his political beliefs.

Josh's political beliefs run deep. He was raised primarily by his dad, Felix Martinez, a staunch believer in the constitution and vocal opponent of government overreach. As Josh grew up, Felix's rhetoric became Josh's rhetoric. Josh's "cop watching" activities were an outgrowth of these beliefs. Not only did Josh receive positive reinforcement from his many social media followers he got it from his dad. Undersigned counsel asked Felix to share with the Court some of the values he instilled in Josh. *See* Exhibit E, Letter in Support.

Forced to stay off social media as a condition of supervision, Josh found a different outlet. He cleaned up the Moapa property, turned the rundown trailer into a home, and worked the land. In the process of rebuilding the land, Josh

7

rebuilt his relationship with Lauren. He became a supportive partner and hands-on dad, not only to his biological children but to Lauren's youngest son, conceived to another man during the couple's separation. This hard work and persistence culminated in June 2022 with the birth of Joshua & Sons Farm LLC. Exhibit F, Business Registration.



A recent Facebook post sums up what this progress means to Josh:





### 3. This Court should vary down because Josh's criminal history is over-represented.

Josh submits criminal history category III over-represents his criminality. He asks the Court to consider the rationale of U.S.S.G. §4A1.3(b) in mitigation under 18 U.S.C. § 3553.

Josh received four criminal history points for one-point offenses. The two most serious—discharging a firearm out of a motor vehicle and battery—occurred when he was 21 and 23 years old, respectively. ECF No. 74 at 9-10, ¶¶29-30. In April, the Sentencing Commission voted to amend the policy statement to U.S.S.G. §5H1.1 AGE in recognition that: "Research has shown that brain development continues until the mid-20s on average, potentially contributing to impulsive actions and reward-seeking behavior."[2] The amended policy statement, which takes effect November 1, 2024, will provide:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

> The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

---

[2] U.S. Sentencing Commission, *Amendments to the Sentencing Guidelines (Preliminary)*, (Apr. 14, 2024), PDF pages 15-16, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202404_prelim-rf.pdf.

Josh received a third point for a 2014 DUI when he was 26—still considered youthful conduct within the amended policy statement to Guideline §5H1.1 (defining youth as lasting "into the mid-20's"). ECF No. 74 at 10, ¶31. Josh's fourth one-point conviction resulted from a disturbance at this courthouse during the Bundy trial in 2018. That behavior was a classic example of the old Josh, engaging with law enforcement for the benefit of social media. *See* ECF No. 74 at 12, ¶34.

Josh has only one felony conviction: attempt carry concealed weapon. The case was charged as a wobbler in state court. *See* Exhibit G, Case Information. If Josh had successfully completed probation, it would have been a misdemeanor. But he messed up. He violated probation and ended up with a felony. ECF No. 74 at 11, ¶33. His excellent compliance on supervision in this case shows this was a hard-learned lesson.

### 4. This Court should vary down because the definition of "large capacity magazine" in the commentary to the firearms Guideline was promulgated contrary to empirical data and national experience.

Josh is subject to a six-level base offense level enhancement under § 2K2.1(a)(4)(B) because he possessed a firearm capable of accepting a large capacity magazine. The commentary to 2K2.1(a)(4)(B) defines the text to include any firearm attached or in close proximity to a magazine "that could accept more than 15 rounds of ammunition[.]" U.S.S.G. § 2K2.1 cmt. n. 2. But for this feature, Josh would be at offense level 11, rather than 17, resulting in a Guidelines range of 12-18 months. This Court should reject the large capacity Guideline range because the Sentencing Commission promulgated the base offense level contrary to "empirical data and national experience," *Kimbrough v. United States*, 552

10

U.S. 85, 109-10 (2007), and as a result, it recommends a sentence that is "greater than necessary, to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2).

The Sentencing Commission has "data-driven expertise on criminal sentencing[.]" *United States v. Adair*, 38 F.4th 341, 359 (3rd Cir. 2022). In *United States v. Mercado*, 81 F.4th 352, 360 (3rd Cir. 2023), for example, the Third Circuit considered "what evidence a district court may consider in assessing whether a defendant has genuinely accepted responsibility" and concluded the Commission "has significant 'data driven' expertise regarding how successive crimes relate to one another and routinely releases in-depth reports related to" recidivism. *Id.* But no such reports exist regarding the distinctions between standard and large capacity magazines. The Commission's most recent firearms-specific report provided "detailed information about offenders sentenced under § 2K2.1[,]" but did not discuss magazine capacity (or semiautomatic weapons) once. *See What Do Federal Firearms Offenses Really Look Like*? U.S.S.C. (July 2022).

There is no rationale grounded in empirical research for punishing possession of large capacity magazines so severely. Large capacity magazines are legal to buy, sell and trade. If there was any evidence that they were especially dangerous or attractive to criminals, a national consensus would have developed to continue their ban. There is no such evidence and no such consensus. Most semiautomatic firearms are capable of accepting—and in fact are sold with—magazines that could accept more than 15 rounds of ammunition. And the vast

11

majority of states—including Nevada—and the federal government do not regulate (and therefore do not define) magazines based on capacity.[3]

### a.   The history of the Guideline demonstrates it is not based on empirical data.

Section 2K2.1 did not initially include an enhancement based on magazine capacity. *See* U.S.S.G. § 2K2.1 (1987) (setting a base offense level of nine for all offenses). That changed when Congress passed the Public Safety and Recreational Firearms Use Protection Act (the "Assault Weapons Ban"), as part of the Violent Crime Control and Law Enforcement Act of 1994 (the "Crime Control Act"). The Assault Weapons Ban prohibited the manufacture, transfer, or possession of a "semiautomatic assault weapon" and the transfer or possession of "a large capacity ammunition feeding device." Pub. L. No. 103-322, §§ 110102–110103, 108 Stat. 1796 (Sept. 13, 1994). The term "semiautomatic assault weapon" was defined by certain manufacturers and models or by certain features but did not focus on magazine capacity. Pub. L. No. 103-322, § 110102. The definition was codified at 18 U.S.C. § 921(a)(30). *Id.* The term "large capacity ammunition feeding device" meant "a magazine … that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of

---

[3] The states that do employ a scattershot approach, with some setting the floor at 10 rounds, others at 15, and still others at 17. *See* Cal. Penal Code §§ 16350, 16740, 16890, 32310-32450; Colo. Rev. Stat. §§ 18-12-301, 302, 303; Conn. Gen. Stat. §§ 53-202w, 53-202q; Del. Code Ann. tit. 11, § 1469(a); D.C. Code Ann. §§ 7-2506.01(b); 7-2507.06(a)(4); Haw. Rev. Stat. Ann. § 134–8(c); Md. Code Ann., Crim. Law § 4-305; Mass. Gen. Laws ch. 140, §§ 121, 131M; N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), 2C:39-9(h); N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10, 265.11, 265.20(7-f), 265.36-265.37; Vt. Stat. Ann. tit. 13, § 4021.

ammunition[.]" Pub. L. No. 103-322, § 110103. The definition was codified at 18 U.S.C. § 921(a)(31). *Id.*

The Sentencing Commission responded to the Crime Control Act by amending the Guidelines. As relevant here, the Commission revised § 2K2.1 "to provide increased offense levels for possession of a semiautomatic assault weapon that correspond to the offense levels currently provided for possession of machineguns and other firearms described in 26 U.S.C. § 5845(a)." U.S.S.G., App. C, amend. 522 (Nov. 1, 1995). The enhancement relied on 18 U.S.C. § 921(a)(30)'s definition of "semiautomatic assault weapon" which prohibited semiautomatic weapons identified by certain manufacturers and models or by certain features but did not focus on magazine capacity. Following this amendment, the same base offense level applied to semiautomatic assault weapons and firearms regulated under the National Firearms Act, 26 U.S.C. §§ 5801–5872.

The Commission also allowed for a possible upward departure when "the defendant possessed a high-capacity, semiautomatic firearm in connection with a crime of violence or controlled substance offense." U.S.S.G. § 5K2.17 (1995); *see also* U.S.S.G., App. C. amend. 531 (Nov. 1, 1995). Although not at issue here, the background to this enhancement is illustrative of the Commission's recognition that flexibility is needed in firearms cases. The Commission added the "in connection with" enhancement in response to Congress's express directive that it "shall amend its sentencing guidelines to provide an appropriate enhancement of the punishment for a crime of violence . . . or a drug trafficking crime . . . if a semiautomatic firearm is involved." Pub. L. 103-322, § 110501. The departure defined "high-capacity semiautomatic firearm" to mean "a semiautomatic firearm

13

that has a magazine capacity of more than ten cartridges" but emphasized that "[*t*]*he extent of any increase should depend upon the* degree to which the nature of the weapon increased the likelihood of death or injury in the *circumstances of the particular case*." U.S.S.G. § 5K2.17 (1995) (emphasis added).

Three factors convinced the Commission that flexibility, rather than rote application, should control the departure's applicability. U.S.S.G., App. C., amend. 531 (Nov. 1, 1995). First, "semiautomatic weapons are used in 50-70 percent of offenses involving a firearm[]" and thus "represent the typical or 'heartland' case[.]" *Id.* Second, "the 'firepower' or 'dangerousness' of semiautomatic weapons, compared to other types of firearms, varies substantially with caliber and magazine capacity." *Id.* Third, "[i]f harm actually results (e.g., death or bodily injury), the guidelines generally take that harm into account directly[]" and "[c]onsequently, in considering any distinction between semiautomatic firearms and other firearms, the issue is whether there is any significant difference in the risk of harm." *Id.* ("For example, in a robbery at very close range, the difference in the likelihood of death or bodily injury between a revolver and semiautomatic pistol would seem to be small. In contrast, in a drive-by shooting the greater firepower of a semiautomatic weapon would likely have a more significant effect on the likelihood of death or injury.").

Thirty months after the Assault Weapons Ban, "Congress commissioned a study . . . which made findings that appear to undermine the rationale for the ban." *United States v. English*, 333 F. Supp. 3d 1311, 1314 (M.D. Ala. 2018) (citing Jeffrey A. Roth & Christopher S. Koper, *Urban Institute Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*, at 2 (Mar. 1997)); *see also* Christopher S. Koper, *Updated Assessment of the*

14

*Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* (July 2004). The study concluded that, "[a]t best, the assault weapons ban can have only a limited effect on total gun murders, because the banned weapons and magazines were never used in more than a fraction of all gun murders," and that there was no detectable reduction "in two types of gun murders that are thought to be closely associated with assault weapons, those with multiple victims in a single incident and those producing multiple bullet wounds per victim." *See* Roth, Koper, et al. at 97. Congress allowed the ban to expire on September 13, 2004.

"Despite Congress's repeal of the ban, and the findings of its study in support of that repeal, the Sentencing Commission in 2006 decided to retain the § 2K2.1 enhancement for semiautomatic weapons, and in fact expanded its definition into its current form." *English*, 333 F. Supp. 3d at 1314. The Commission deleted § 2K2.1's reference to 18 U.S.C. § 921(a)(30) and replaced the reference with the term "a semiautomatic firearm capable of accepting a large capacity magazine, which is defined in Application Note 2." U.S.S.G., App. C, amend. 691 (Nov. 1, 2006). Without explanation, the Commission arbitrarily raised the "floor" for large magazine capacity from 10 rounds (as defined in the ban) to 15 rounds (as defined in Application Note 2).

"The Commission never addressed whether the enhancement for semiautomatic firearms should continue to apply or continue to apply to the same degree after Congress had repealed the Act under which it was initially adopted, or in light of the findings in the congressional study." *English*, 333 F. Supp. 3d at 1314. The Commission's sole reason for the amendment was "inconsistent

application . . . in light of the ban's expiration." *Id.* The amendment's result was continued equal treatment of now-legal semiautomatic firearms and illegal firearms. The commentary continues to treat "a semiautomatic firearm capable of accepting a large capacity magazine" as the equivalent of a machinegun, sawed off shotgun, short-barreled rifle, or destructive device. *See* U.S.S.G. § 2K2.1 (applying a base offense level of 20 if the offense "involved a (I) semiautomatic firearm that is capable of accepting a large capacity magazine; or (II) a firearm that is described in 26 U.S.C. § 5845(a)[]"). But Congress eliminated that parity by allowing the Assault Weapons Ban to expire. With its expiration, federal law became more permissive while the Guidelines became more restrictive and punitive.

For the first time, there was a serious sentencing enhancement under the Guidelines for possession of magazines that were (once again) legal under federal law. The equivalence creates unwarranted uniformity and lacks the flexibility the Sentencing Commission previously recognized as necessary to reflect national experience in firearms cases. The Commission reviewed data when responding to Congress's directive to enhance "the punishment for a crime of violence… or a drug trafficking crime… if a semiautomatic firearm is involved." Pub. L. 103-322, § 110501. The review compelled the Commission to "allow[] the courts flexibility to take this factor into account as appropriate in the circumstances of the particular case." U.S.S.G., App. C. amend. 531 (Nov. 1, 1995). The commentary to § 2K2.1(a)(4)(B) is devoid of that flexibility.

The Commission previously recognized that "semiautomatic weapons are used in 50-70 percent of offenses involving a firearm[]" and thus "represent the

typical or 'heartland' case[.]" U.S.S.G., App. C., amend. 531 (Nov. 1, 1995). And most semiautomatic weapons are capable of accepting a magazine with more than 15 rounds. As the government has conceded elsewhere: "Today, the terms 'semiautomatic firearm' and 'able to accept a large-capacity magazine' are essentially synonymous. The exception has swallowed the rule." *United States v. Fuller*, No. 7:20-cr-0035 (W.D. Va.) D.I. 69.

Josh asks this Court to do as it has in other cases involving Guidelines that run counter to empirical data and national experience: choose not to rely on it.

> **5.     This Court should vary down because the validity of Josh's statute of conviction is in question.**

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court cast doubt on the validity of statutes restricting the right to bear arms under the Second Amendment. *Bruen* applies a two-part test to analyze the constitutionality of such statutes, which requires determining whether: (1) "the Second Amendment's plain text covers an individual's conduct;" and (2) if so, the government must show a challenged law "is consistent with the Nation's historical tradition of firearm regulation" from 1791. *Bruen*, 597 U.S. at 24. In *United States v. Duarte*, 101 F.4th 657, 661-62 (9th Cir. 2024), *vacated pending reh'g en banc*, 2024 WL 3443151 (9th Cir. July 17, 2024), the Ninth Circuit held courts must conduct this two-step text-and-history inquiry in "all Second Amendment challenges." *Duarte*, 101 F.4th at 661.

*Bruen*'s first step determines whether the Second Amendment's plain text covers the person's proposed course of conduct, the arm involved, and the person challenging the law. *Duarte*, 101 F.4th at 661-62. "If the Second Amendment's

bare text covers the person, [her] arms, and [her] conduct," *id.,* then the Court conducts the second step—a historical inquiry.

At *Bruen*'s second step, "the government must [ ] demonstrate that the challenged regulation is consistent with this Nation's historical tradition of firearm regulation." "To meet its burden, the Government must identify a well-established and representative historical analogue to the challenged law." *Duarte*, 101 F.4th at 665 (cleaned up). This historical inquiry "requires reasoning by analogy, in which the two central considerations will be whether 'how' the proffered historical analogue burdened the Second Amendment right and 'why' it did so are both sufficiently comparable to the challenged regulation." *Id.* (cleaned up). "Only if the government proves that its firearm regulation is consistent in this sense with the Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (cleaned up).

*Bruen*'s first prong asks whether the Second Amendment's plain text covers the statutory regulated conduct. *Bruen*, 597 U.S. at 24. *Duarte* clarifies this prong, asking "whether the Second Amendment's plain text covers (1) the individual, (2) the type of arm, and (3) the proposed course of conduct that are at issue." 101 F.4th at 670-71 (cleaned up). All three requirements fall within the Second Amendment as applied here. First, Josh is a United States citizen, thus qualifying as "the people" covered by the Second Amendment. *Duarte* explained at length that "the people" referred to in the Second Amendment encompasses all United States citizens. 101 F.4th at 671. Second, this case primarily involves the possession of a rifle. The Second Amendment protects arms that were in common

use at the time of the founding as well as those in common use today. *Bruen*, 597 U.S. at 47. "Handguns, rifles, and shotguns are the general types of firearms that are in common use by ordinary citizens for lawful purposes." *Capen v. Campbell*, No. 22-cr-11431-FDS, 2023 WL 8851005, at *8 (D. Mass. Dec. 21, 2023). Third, the conduct involved—possessing a firearm—clearly falls within the Second Amendment's plain text. "[S]imple possession" of a firearm constitutes protected Second Amendment activity. *Bruen*, 597 U.S. at 671.

Because Josh presumptively retains the right to possess the firearm at issue in this case, the government can justify 922(g)(1)'s prohibition on his possession of firearms only if it identifies a suitably analogous historical tradition of firearms regulation. In *Duarte*, the Ninth Circuit suggested the government could meet its burden of demonstrating Section 922(g)(1) is constitutional as applied in a particular case only if it "proffer[s] Founding-era felony analogues that are 'distinctly similar' to [the defendant's] underlying offenses and would have been punishable either with execution, with life in prison, or permanent forfeiture of the offender's estate." 2024 WL 2068016, at *24. The Court found the government failed to meet its burden of "demonstrating that permanently depriving Duarte of this fundamental right is otherwise consistent with our Nation's history." 101 F.4th at 691. The government has not done so here.

On July 17, the Ninth Circuit voted to rehear *Duarte* en banc. Oral argument is pending. Although no longer binding, the *Duarte* panel opinion remains persuasive authority. *Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2002) ("Vacated opinions remain persuasive . . . authority" (collecting cases)). And so the Ninth Circuit has, for instance, adopted vacated reasoning as

"persuasive" even though an opinion was reversed on other grounds by the Supreme Court and then vacated in its entirety by the en banc court. *See Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1024 (9th Cir. 2010) (citing *Chamber of Com. of U.S. v. Lockyer*, 463 F.3d 1076 (9th Cir. 2006) (en banc), *rev'd on other grounds sub nom. Chamber of Commerce v. Brown*, 554 U.S. 60 (2008) and *vacated by* 543 F.3d 1117 (2008) (en banc)). The Ninth Circuit has also cited the "persuasive force" of out-of-circuit panel opinions that have been vacated by the other circuit en banc. *See Hart v. Massanari*, 266 F.3d 1155, 1159 (9th Cir. 2001) (citing *Anastasoff v. United States*, 223 F.3d 898 (8th Cir.), *opinion vacated on reh'g en banc*, 235 F.3d 1054 (8th Cir. 2000)). "[S]tatements in a vacated opinion," in brief, continue to carry the "persuasive value" courts "think they deserve." *United States v. W.B.H.*, 664 F.3d 848, 853 n.1 (11th Cir. 2011) (cleaned up).[4]

---

[4] Moreover, the decision to rehear *Duarte* does not foreshadow any particular result on the merits. *See* FED. R. APP. P. 35(a) (permitting en banc proceedings to "secure or maintain uniformity" or to address "a question of exceptional importance," rather than to correct error). Quite the opposite, the en banc Ninth Circuit commonly reaches the same conclusions as vacated panel opinions. *See, e.g.*, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 679–80, 685–96 (9th Cir. 2023) (en banc); *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1082–1105 & n.10 (9th Cir. 2020) (en banc). So do other courts of appeals in which all active judges sit for en banc proceedings. *See also, e.g.*, *Harness v. Watson*, 47 F.4th 296, 299–300 (5th Cir. 2022) (en banc) (per curiam); *Hammoud v. Ma'at*, 49 F.4th 874, 877 (5th Cir. 2022) (en banc).

Indeed, there is reason not to overread rehearing votes in the Ninth Circuit specifically. In this Circuit, every qualified active judge and select senior judges vote on petitions for rehearing en banc. *See* 9th Cir. Advisory Comm. Note 2 to Rules 35-1 to 35-3. But only eleven of those judges sit on the en banc court. *See* 9th Cir. Rule 35-3. So the ultimate en banc decision will be made by only a

On the unconstitutionality of 18 U.S.C. § 922(g)(1), *Duarte*'s answer ("yes") remains highly persuasive. As explained, the conduct at issue here is covered by the Second Amendment. *See* ECF Nos. 24, 26. Under still-binding authority, the government then had to carry the "demanding" burden of "identify[ing] a 'well-established and representative historical analogue'" to § 922(g)(1). *Baird v. Bonta*, 81 F.4th 1036, 1046 (9th Cir. 2023) (quoting *N.Y. State Rifle and Pistol Assoc. v. Bruen*, 597 U.S. 1, 22 (2022)). The government here has not identified any such analogue for § 922(g)(1)'s "permanent bar on possession." *Duarte*, 2024 WL 3443151, at *3 (VanDyke, J., dissenting from the grant of rehearing en banc). Indeed, unlike historical provisions that involved "judicial determinations" of a particular defendant's dangerousness, *United States v. Rahimi*, 144 S. Ct. 1889, 1902 (2024), § 922(g)(1)'s permanent dispossession "equally applies to felons who have no history of or expected propensity towards violence," *Duarte*, 2024 WL 3443151, at *3 (VanDyke, J., dissenting from the grant of rehearing en banc). With these distinctive features, § 922(g)(1) is historically anomalous. *Id.* at *5. Josh urges the Court to consider the question mark hanging over the constitutionality of the statute when sentencing him.

---

subset of those that considered rehearing—making the initial rehearing decision poor guide for any eventual merits result.

**III.   Conclusion**

Josh respectfully moves the Court to sentence him to credit for time served and one year of supervised release.

DATED: September 11, 2024.

RENE L. VALLADARES
Federal Public Defender

By:   */s/ Joanne L. Diamond*
JOANNE L. DIAMOND
Assistant Federal Public Defender
Counsel for Joshua Martinez

22